IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CASE NO: 5:19-cv-386

| | |
|---|---|
| DREAM YACHT AMERICAS, INC., and DREAM YACHT CHARTER,<br><br>      Plaintiffs,<br><br>    v.<br><br>BLACK TRAVEL MOVEMENT, LLC, and REGINALD E. CUMMINGS,<br><br>      Defendants. | **VERIFIED COMPLAINT** |

Plaintiffs Dream Yacht Charter, a Mauritius company, and Dream Yacht Americas, Inc., trading as Dream Yacht Charter (collectively, "Plaintiffs" or "DYC"), by and through their undersigned attorneys, hereby file this Complaint against Defendants Black Travel Movement, LLC ("BTM") and Reginald E. Cummings (collectively, "Defendants"). In support, DYC states as follows:

### Parties, Jurisdiction, and Venue

1.    Plaintiff Dream Yacht Charter, is a Mauritius company with its principal place of business located at Suite 3, Medine Business Park, Royal Road, Cascavelle, Mauritius 90203. Dream Yacht Charter is wholly owned by Wally, S.A., a Belgian company with its principal place of business in Belgium.

2.    Plaintiff Dream Yacht Americas, Inc., trading as Dream Yacht Charter, is a Maryland corporation with its principal place of business located at 7080 Bembe Beach Road, Suite 211, Annapolis, Maryland 21403.

3. Defendant Black Travel Movement, LLC ("BTM"), is a North Carolina limited liability corporation with its principal place of business located at 4705 Porchaven Lane, Apex, Wake County, North Carolina. Publicly available records indicate that Reginald Cummings, a citizen of the State of North Carolina, formed BTM in 2016, that Mr. Cummings is the Chief Executive Officer and the registered agent of BTM, and that the principal office of BTM is located at Mr. Cummings's home address. According to the BTM website, Mr. Cummings is also the founder of BTM. The identities of the members of a limited liability company organized under North Carolina law are not publicly available. Upon information and belief, no LLC member of BTM is a citizen of the State of Maryland or a citizen of Mauritius.

4. Defendant, Reginald E. Cummings is a citizen of the State of North Carolina, whose address is 4705 Porchaven Lane in Apex, North Carolina.

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), because, upon information and belief, complete diversity of citizenship exists, and the amount in controversy exceeds $75,000.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because, upon information and belief, both Defendants reside in this judicial district.

7. This Court has personal jurisdiction over Defendants because, upon information and belief, both Defendants reside in North Carolina.

**FACTS COMMON TO ALL COUNTS**

8. Dream Yacht Charter is one of the largest yacht charter companies in the world. DYC has the largest and most diverse fleet of yachts in terms of models and manufacturers in the market. DYC offers yacht charters across the globe, from destinations such as the Caribbean, to

2

many European islands, and beyond. Dream Yacht Americas, Inc. d/b/a Dream Yacht Charter is a wholly owned subsidiary of Dream Yacht Charter, a Mauritius company.

9. BTM is an online travel organization that organizes domestic and international travel experiences for its members. BTM organizes approximately 20 trips per year and boasts of planned trips to Dubai and Egypt in 2019. "About Black Travel Movement," https://www.blacktravelmovement.net/about-btm/ (last visited Aug. 29, 2019) (attached as Exhibit 1). At all times relevant to this Complaint, Mr. Cummings held himself out as the founder of BTM and acted as its agent, employee, and/or representative.

10. On or about June 12, 2018, Mr. Cummings contacted DYC regarding the charter of yachts from DYC for an event marketed by BTM as "SAILNOIR" or "Black Yacht Week," to take place in the British Virgin Islands from June 22, 2019 to June 29, 2019.

11. On or about July 1, 2018, DYC sent quotes to BTM for the types of vessels requested. Following discussions between Mr. Cummings and Erin Houpt, Charter Manager of the Americas for DYC, the parties settled on booking 26 vessels that could collectively hold up to approximately 250 persons for the Black Yacht Week event. Each yacht was "fully crewed" and included a captain and a chef.

12. On or about July 19, 2018, Mr. Cummings, on behalf of himself and as an agent of BTM, wired a sixty thousand dollar ($60,000.00) deposit to the bank account of Dream Yacht Americas, Inc.[1] Because the total amount Defendants would owe to DYC was not only dependent on the number and type of yachts, but also the number of passengers on each vessel

---

[1] At the time, the entity receiving the wire transfer was Annapolis Bay Charters, Inc. Its name was subsequently changed to Dream Yacht Americas, Inc., Plaintiff in this action, in or around December 2018. It is the same entity.

3

due to fees levied by the local government, the exact total amount due could not yet be determined.

13. Over the next several months, DYC assisted BTM with the planning of Black Yacht Week, including creating an itinerary and providing information about each yacht so that BTM could properly assign the passengers to the yachts.

14. BTM marketed the event to its members on its website and on its social media accounts, promoting the event as an alternative to the original Yacht Week hosted by the European Travel Company. BTM set forth the itinerary for the event on its website and gave its members different booking options, either "the Premium Crewed Yacht" or "the Super Premium Crewed Yacht." The different options involved the type of yacht on which the members would travel, and the cost of the travel package. "2019 Black Yacht Week," https://www.blacktravelmovement.net/tours/sail-noir/ (last visited Aug. 29, 2019) (attached as Exhibit 2).

15. BTM marketed the Black Yacht Week experience as including all meals, snacks, and beverages, free wireless internet, double staterooms with en suite lavatory and shower, freshwater showers, housekeeping services, flat screen TVs, air conditioning, snorkeling equipment, fishing gear, and other water activities, as well as a yacht damage waiver.

16. BTM priced the Premium Crewed Yacht package at $2,950.00 and the Super Premium Crewed Yacht package at $3,350.00. BTM also stated that payment was due in full at the time of the member's registration and that no refunds would be provided.

17. Upon information and belief, the members of BTM who participated in the Black Yacht Week paid Defendants for the event.

4

18. On May 14, 2019, DYC contacted Defendants regarding the coordination of other details, including yacht passenger assignments, requests for provisions for the trip (known as "provisioning"), and the final itinerary. DYC had not yet calculated the final balance due, because it had not received the final passenger lists and provisioning requests necessary to calculate the balance. At this time, DYC reiterated the exigency in determining these final details so that the final balance could be calculated, and payment made prior to departure pursuant to DYC contract and policy.

19. From May 14, 2019, until the days leading up to the scheduled departure date, DYC repeatedly asked Defendants to provide the final passenger lists, as well as lists of provisioning requests, so that a final balance could be determined and paid. Defendants either failed to respond to these inquiries, were evasive, or promised to provide this information promptly and failed to do so.

20. On or about June 6, 2019, Mr. Cummings, acting on behalf of himself and as an agent of BTM, finally sent to DYC the food allergy and preference lists to stock the 26 vessels.

21. On June 12, 2019, DYC requested confirmation of the final passenger assignments so that the invoice totals could be updated, a final balance could be determined, and Defendants could make the final payment. On June 13, 2019, Mr. Cummings, acting on behalf of himself and as an agent of BTM, represented in writing that he would finalize and send the required information on the same day. Defendants failed to provide the information by June 13, 2019 as promised.

22. On June 17, 2019, Defendants finally sent to DYC the beverage provisioning lists to stock the vessels.

23. By June 18, 2019, Defendants had still failed to finalize the passenger assignments and provide a final headcount to DYC. Unable to calculate the final balance due without the final passenger assignments, DYC informed Defendants by email that the final balance due based on the information that Defendants had previously provided would total $519,934.00. DYC explained to Defendants that DYC had agreed to wait to receive final payment until the final passenger list was complete so that the fees charged by the British Virgin Islands could be included[2]; however, on June 18, 2019, DYC requested that the $519,934.00 balance be paid, and agreed to work out any small discrepancies in the amount Defendants owed thereafter.

24. Mr. Cummings, acting on behalf of himself and as an agent of BTM, responded to the June 18, 2019 email from DYC with a phone call, in which he confirmed the final headcount and passenger assignments with DYC.

25. Based on the information Defendants provided, on June 19, 2019, DYC sent an email to Defendants stating that the final balance due from Defendants, including the British Virgin Islands fees, was $518,290.00. DYC requested that payment be made the same day. On June 19, 2019, Mr. Cummings, acting on behalf of himself and as an agent of BTM, responded by email confirming that he would send payment by wire the following day, on June 20, 2019, because his bank's wire department had closed for the day.

26. Separately, Defendants contracted with DYC for alcohol provisioning for all of the yachts, in an amount totaling $33,493.77.

---

[2] The British Virgin Islands government assesses fees per passenger on each vessel, which include a BVI cruising tax (per person, per day charge), a BVI national park fee (per boat, per week charge), and the search and sea rescue fee (per person, per charter charge).

27.     DYC asked Defendants about the status of the wire transfer on DYC on June 20, 2019, by sending an email to Mr. Cummings.  On June 20, 2019, Mr. Cummings, acting on behalf of himself and as an agent of BTM, represented in a text message that he could "have the bank draw up some kind of letter" to prove that the money to cover the final balance due was being wired immediately as promised.  At that time, Mr. Cummings, acting on behalf of himself and as an agent of BTM, verbally represented to DYC that his business partner, Jesse Russell, and Mr. Russell's company, incCOMMUNICATIONS Services, Inc., would be paying the final balance owed by BTM.  Defendants provided DYC with Mr. Russell's contact information in order to facilitate the payment of the money owed.

28.     DYC repeatedly demanded final payment on June 21, 2019, the day before the 26 yacht charters were scheduled to begin.  Finally, Mr. Russell, acting as an agent of Defendants, spoke with Ms. Houpt and said that the requisite funds were immediately en route to his bank account from a bank in Ghana and he would promptly wire the funds to DYC.  That same day, Mr. Cummings, acting on behalf of himself and as an agent of BTM, emailed Mr. Russell, copying Ms. Houpt of DYC, and stated "[p]er our discussion today, once the funds are cleared and available, please wire $518,290 to Dream Yacht Charters per the attached wire instructions."  6/21/2019 Email from R. Cummings to J. Russell (attached as Exhibit 3).  The attached wire instructions contained wire information for DYC's bank account in Annapolis, Maryland.

29.     On the morning of June 22, 2019, the date on which the BTM members were expected to board the vessels, Mr. Cummings met with Ms. Houpt in person at the port in the British Virgin Islands and said that the funds to pay the final balance due were being wired at that very moment.  When pressed for more information, Mr. Cummings promised that he "would make sure it was done."

7

30.     That same morning, before the BTM members boarded the 26 vessels, Mr. Cummings, acting on behalf of himself and as an agent of BTM, confirmed the agreement between the parties by signing 26 invoices for the charter of 26 yachts for the week of June 22, 2019 to June 29, 2019, as well as the terms and conditions of the charters ("Charter Agreements"). *See, e.g.*, Charter Agreement No. 18090296 (attached as Exhibit 4). Pursuant to the Charter Agreements, which had previously been provided to Defendants, though not signed, the parties agreed that the balance under the Charter Agreements would be paid in full prior to the embarkation of the vessels on June 22, 2019.

31.     Also on the morning of June 22, 2019, the day on which approximately 230 BTM members were set to embark on a weeklong yacht charter excursion following their arrival in the British Virgin Islands, Mr. Russell, acting as an agent of Defendants, emailed a "Proof of Funds" letter to DYC from the Fidelity Bank Ghana, and further represented to DYC that was he was "very confident that our funds will post into our Wells Fargo Bank account early next week." That letter represented that Mr. Russell had two million dollars ($2,000,000) available to satisfy Defendants' outstanding financial obligations to DYC. 6/22/2019 Email from J. Russell to E. Houpt attaching Proof of Funds letter (Exhibit 5).

32.     At all times alleged in this Complaint, Mr. Russell and his company, incCOMMUNICATIONS Services, Inc., were acting as agents and/or representatives of BTM and Mr. Cummings.

33.     Faced with approximately 230 members of BTM who had traveled to the British Virgin Islands, paid BTM or Mr. Cummings for the trip, and were now waiting at the port to board the yachts, DYC decided to allow the charters to embark even though Defendants had not paid the amount they owed to DYC. DYC made this decision in reliance upon the express

8

representations by BTM and Mr. Cummings, made by Mr. Cummings and by Mr. Russell acting as Defendants' agent, that the balance due would be paid within a matter of days, and during the charter week. The yachts left the port on June 23, 2019, with all 230 BTM members on board, including Mr. Cummings. Prior to leaving, Mr. Cummings, acting on behalf of himself and as an agent of BTM, again represented to Ms. Houpt that BTM would have the funds to pay the balance due in its bank account within a day or two.

34. Upon information and belief, the patrons on Black Yacht Week paid BTM or Mr. Cummings directly for their yacht charters. Depending on which option the patrons paid for, Defendants collected between $678,500 and $770,500.[3] Thus, Defendants had received enough funds to pay for the final balance owed DYC.

35. During the first few days of the charters, Ms. Houpt was informed by Mr. Cummings and a few individual members of BTM that some of the food and alcohol provisioning was missing items or otherwise incomplete on some of the vessels. DYC worked to fix this problem, including sending a speed boat out to the vessels with provisions, and providing the skippers and/or chefs on the vessels with cash in order to purchase additional food and alcohol. On June 24, 2019, Mr. Cummings sent a text message to Ms. Houpt threatening not to pay if the issues with provisioning the vessels were not fixed by the following day. DYC understood at the time that all issues with provisioning were fixed within the first three days of the charter week (on or before June 25, 2019).

36. DYC emailed and sent text messages to Mr. Cummings and Mr. Russell throughout the charter week repeatedly demanding payment of the final balance due as promised

---

[3] BTM priced the Premium Crewed Yacht package at $2,950.00 and the Super Premium Crewed Yacht package at $3,350.00. For 230 patrons, the total paid to BTM was between $678,500 and $770,500.

9

since no monies were received by wire as had been represented. Mr. Cummings and Mr. Russell failed to respond to most of the messages, and when they did respond, their responses were incomplete. Ms. Houpt spoke with Mr. Cummings by phone on three occasions during the weeklong charter, and on each occasion, Mr. Cummings, acting on behalf of himself and as an agent of BTM, insisted the funds would be or had already been wired to DYC.

37. On Tuesday, June 25, 2019, while sailing the British Virgin Islands, Mr. Cummings, acting on behalf of himself and as an agent of BTM, spoke with Ms. Houpt on the phone and said that he believed the funds had already been sent and would follow up with Mr. Russell. Mr. Russell, acting as an agents of Defendants, stated to Ms. Houpt by email later that day, "Just got off the phone with our Bank that was tracing our funds and he informed me that our funds are in process; the U.S. Treasury Department has a backlogged, but our funds should hit my account tomorrow."

38. On Wednesday, June 26, 2019, while BTM members and Mr. Cummings were sailing the British Virgin Islands, DYC tried to contact Mr. Cummings and Mr. Russell approximately nine times without response.

39. On Thursday, June 27, 2019, the day before the yachts were scheduled to arrive back at the port, Mr. Cummings finally responded, acting on behalf of himself and as an agent of BTM, "I assume that the payment you are waiting for has not been completed. I will reach out to Jesse for an update and call you back when I get service. Is there any other pressing issue?" Ms. Houpt implored Defendants to make final payment, but DYC received no further response.

40. On June 28, 2019, the date on which the yachts returned to the port, DYC still had not received the funds as promised prior to departure and confronted Mr. Cummings with a Confession of Judgment for his signature, which he signed. The Confession of Judgment states

that Mr. Cummings is obligated to DYC for a principal sum of $551,783.77 for the failure to remit payment under the charter contracts. On August 5, 2019, a Notice of Confessed Judgment was entered against Mr. Cummings in the Circuit Court of Anne Arundel County, Maryland.

41. Following the conclusion of the yacht charters, DYC, directly and through counsel, continued to reach out to BTM, Mr. Cummings, and Mr. Russell to demand payment. BTM, through its agents Mr. Cummings and Mr. Russell, continued to be evasive and put DYC off by stating that the U.S. Department of Treasury was in possession of the funds from the Bank of Ghana, and therefore, there was nothing that could be done until those funds were cleared and deposited in Mr. Russell's account. DYC requested proof that the U.S. Department of Treasury was holding these funds, but neither Mr. Cummings nor Mr. Russell provided any such proof.

42. Mr. Cummings, acting on behalf of himself and as an agent of BTM, also represented on numerous occasions that BTM would be wiring a substantial partial payment to DYC, less any monies to account for any set-offs due to member complaints regarding the charters. DYC never received any further payment for the charters.

43. DYC, through counsel, sent a demand letter to Mr. Cummings and Mr. Russell on July 31, 2019 requesting payment in full for the amount due ($551,783.77). Shortly thereafter, Defendants said that they intended to make a good faith payment to DYC on the balance owed. DYC, through counsel, sent follow-up emails to Mr. Cummings on August 6, 2019 and August 13, 2019, to which no response was received. DYC, through counsel, sent a follow-up email to Mr. Russell on August 13, 2019, to which no response was received.

11

## COUNT I
### Breach of Contract

44. DYC incorporates and adopts Paragraphs 1 through 43 as if fully set forth herein.

45. Defendants entered into a contract with DYC whereby DYC agreed to provide Defendants with 26 fully crewed yachts, equipped with provisioning, menus, and an itinerary, in exchange for Defendants' agreement to pay DYC for these services. The terms of the contract include the Charter Agreements, which Mr. Cummings signed on behalf of himself and acting as an agent of BTM.

46. DYC performed according to the terms of the parties' contract by providing the agreed-on services, and Defendants accepted those services.

47. Defendants breached their contract with DYC by failing to pay DYC for those services, other than a $60,000.00 deposit.

48. As a result of Defendants' breach of contract, DYC has been damaged in an amount of at least $551,783.77.

## COUNT II
### Unjust Enrichment

49. DYC incorporates and adopts Paragraphs 1 through 48 as if fully set forth herein.

50. DYC conferred a measurable and substantial benefit on Defendants by providing Defendants with 26 yachts for a weeklong charter for Black Yacht Week. Each vessel was equipped with a full crew, including a skipper and chef, as well as food, alcohol, and a daily itinerary.

51. DYC did not confer this benefit on Defendants gratuitously. Rather, the parties understood and agreed that Defendants would pay DYC for these services and DYC expected to be paid for these services.

52. Defendants consciously accepted the benefit DYC conferred, by using the services provided by DYC and partaking in a weeklong cruise of the British Virgin Islands essentially for free (less a $60,000 deposit).

53. Defendants were unjustly enriched by the benefit DYC conferred, because Defendants received valuable services without paying for those services. Upon information and belief, Defendants also profited from the services DYC provided because Defendants were compensated by members of BTM participating in Black Yacht Week, in an estimated amount of at least between $678,500 and $770,500 which they collected from BTM's members.

54. BTM's website provided that the value of the Premium Crewed Yacht package was $2,950.00 and the value of the Super Premium Crewed Yacht package was $3,350.00. BTM also stated on its website that payment was due in full at the time of the member's registration and that no refunds would be provided. Approximately 230 members of BTM participated in Black Yacht Week.

55. Defendants have been unjustly enriched at DYC's expense in an amount of at least $551,783.77.

## COUNT III
### Fraud

56. DYC incorporates and adopts Paragraphs 1 through 55 as if fully set forth herein.

57. Mr. Cummings and BTM represented to DYC that Defendants would pay for yacht services that DYC provided to Defendants. Mr. Cummings and BTM never intended to pay DYC the balance for the yacht services DYC provided to Defendants. Mr. Cummings and BTM knew at the time that Mr. Cummings and Mr. Russell represented to DYC that monies had been wired or were being wired that all such representations were false.

58. Mr. Cummings, acting on behalf of himself and as an agent of BTM, and Mr. Russell, acting as an agent of Defendants, made numerous representations to DYC that the money for the balance owed on the charters was being wired to DYC. Mr. Cummings and BTM made numerous representations that DYC would be paid for the services provided knowing at the time such statements were false. Specifically, Mr. Cummings and BTM made the following representations:

   a. On May 20, 2019 or May 21, 2019, Mr. Cummings and Ms. Houpt had a phone call in which final payment for the charters was discussed. During that phone call, Mr. Cummings verbally represented that final payment would be made promptly upon determination of the final passenger list.

   b. On June 19, 2019 at 4:56 p.m., Mr. Cummings sent an email to Ms. Houpt, stating, "I will send the payment wire tomorrow."

   c. On June 21, 2019 at 12:39 a.m., Mr. Cummings sent an email to Mr. Russell with a carbon copy to Ms. Houpt, stating, "Per our discussion today, once the funds are cleared and available, please wire $518,290 to Dream Yacht Charters per the attached wire instructions. Please put BYW 2019 in the wire field memo." (Exhibit 3).

   d. On June 21, 2019 at approximately 5:08 p.m., during a phone call between Ms. Houpt and Jesse Russell, Mr. Russell stated that the funds to pay for the charters were expected to post in his company's account by Monday, June 24, 2019, or Tuesday, June 25, 2019, at the latest, at which time those funds would be wired to DYC.

e. On June 22, 2019 at 11:34 a.m., Mr. Russell sent an email to Ms. Houpt with a carbon copy to Mr. Cummings, stating, "As per our discussion yesterday, I am Reggie Cummings [sic] business partner and he has provided me with your bank wiring information, such that, I can wire your payment directly into your bank account, once the funds have posted into our company's account. Please find attached a copy of a Proof of Funds letter that has been provided to us by my bank as proof that we have the funds to make your payment. We are very confident that our funds with post into our Wells Fargo Bank account early next week as we discuss [sic] yesterday." (Exhibit 5).

f. Prior to leaving the port on June 23, 2019, Mr. Cummings stated to Ms. Houpt in person that the funds were expected in Mr. Russell's bank account and would be transferred to DYC within a day or two.

g. On June 25, 2019 at 5:13 p.m., Mr. Russell sent an email to Ms. Houpt that stated: "Just got off the phone with our Bank that was tracing the funds . . . our funds should hit my account by tomorrow."

h. On June 25, 2019, June 26, 2019, and June 27, 2019, Ms. Houpt had phone conversations with Mr. Cummings, while Mr. Cummings was sailing the British Virgin Islands on DYC's vessel, in which Mr. Cummings stated that payment for the charters would be made promptly.

i. On July 16, 2019, Mr. Cummings sent a text message to Ms. Houpt, stating, "I expected the funds to be available on Monday. I will speak with Jesse [Russell] soon and instruct him to wire the funds today."

59. These representations to DYC were false. Contrary to the representations described above, Defendants did not pay DYC the amount owed for the charter services. Defendants never initiated, or attempted to initiate, a wire payment to DYC for the final balance, because Defendants never intended to pay for DYC's services, or to cause DYC to be paid by Mr. Russell.

60. The false representations were reasonably calculated to deceive DYC because the misrepresentations were intended to induce DYC to believe that payment would be made and was in progress or imminent, thereby leading DYC to allow all BTM members to embark on the yacht charters and enjoy the entire week of the yacht charters, despite Defendants' failure to pay for the services DYC provided.

61. BTM and Mr. Cummings intended to deceive DYC because BTM and Mr. Cummings never intended to pay for the yacht charters. Defendants intended to make a relatively small deposit on the 26 yacht charters (of $60,000.00) and thereafter make no additional payments. Defendants' deception was a scam to persuade DYC to allow BTM to charge its members and provide them with a weeklong vacation, at almost no cost to Defendants.

62. DYC was deceived by Defendants' false representations because DYC, reasonably relying on the misrepresentations, allowed the charters to take place without final payment being made.

63. As a result of DYC's reasonable reliance on the false representations, DYC has been damaged in an amount of at least $551,783.77.

## COUNT IV
## Violation of N.C. Gen. Stat. § 75-1.1

64. DYC incorporates and adopts Paragraphs 1 through 63 as if fully set forth herein.

65. As alleged above, Defendants made numerous misrepresentations that DYC would be paid for the services provided. Mr. Cummings, on behalf of himself and acting as an agent of BTM, and Mr. Russell, acting as an agent of Defendants, made numerous misrepresentations to DYC that the funds for the balance owed on the charters would be paid and were being wired to DYC.

66. These representations were false. Contrary to the representations described above, Defendants never initiated, or attempted to initiate, a wire payment to DYC for the final balance. Defendants never intended to pay for DYC's services, or to cause DYC to be paid by Mr. Russell. BTM's false representations constitute unfair or deceptive acts or practices in violation of section 75-1.1(a) of the North Carolina General Statutes.

67. Defendants' misrepresentations are acts or practices in or affecting commerce, because the misrepresentations affected the business activities of DYC.

68. DYC was deceived by Defendants' misrepresentations because DYC, reasonably relying on the misrepresentations, allowed the charters to take place without final payment being made. Because DYC reasonably and actually relied on the misrepresentations, the misrepresentations proximately caused injury to DYC in an amount of at least $551,783.77.

## PRAYER FOR RELIEF

WHEREFORE, for all of the foregoing reasons, DYC respectfully requests that the Court grant the following relief:

1. Judgment entered in favor of DYC and against Defendants for actual damages in an amount of $551,783.77;

17

2. Award consequential and incidental damages in an amount to be determined at trial;

3. An award of treble damages;

4. An award of punitive damages based on Defendants' intentional fraud;

5. An award of DYC's reasonable attorneys' fees and court costs in prosecuting this action;

6. An award to DYC of pre-judgment and post-judgment interest on all sums awarded at the highest rate permitted by law; and

7. An award to DYC of such further relief, legal and equitable, to which it is justly entitled.

This the 30th day of August, 2019.

/s/ Paul K. Sun, Jr.
Paul K. Sun, Jr.
N.C. State Bar No. 16847
Kelly Margolis Dagger
N.C. State Bar No. 44329
**ELLIS & WINTERS LLP**
P.O. Box 33550
Raleigh, North Carolina 27636
Telephone: (919) 865-7000
Facsimile: (919) 865-7010
paul.sun@elliswinters.com
kelly.dagger@elliswinters.com

*Counsel for Plaintiffs Dream Yacht Americas, Inc. and Dream Yacht Charter*

OF COUNSEL
Jonathan P. Kagan
Meagan C. Borgerson
**KAGAN STERN MARINELLO & BEARD, LLC**
238 West Street
Annapolis, Maryland 21401
Telephone: (410) 216-7900
Facsimile: (410) 705-0836
kagan@kaganstern.com
borgerson@kaganstern.com

*Of Counsel for Plaintiffs Dream Yacht Americas, Inc. and Dream Yacht Charter*

## VERIFICATION

    I, ERIN HOUPT, CHARTER MANAGER OF THE AMERICAS, AM AUTHORIZED BY DREAM YACHT CHARTER AND DREAM YACHT AMERICAS, INC., TO VERIFY THIS COMPLAINT ON THEIR BEHALF. ON BEHALF OF THE FOREGOING COMPANIES, I SOLEMNLY AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE FOREGOING COMPLAINT IS TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION, AND BELIEF.

Dated: August 30, 2019

_____
Erin Houpt